

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**BEAUMONT DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA § | |
| § | |
| v.   § | CASE NO. 9:06-CR-16 |
| § | |
| RYAN JAMES EFF § | |

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS STATEMENT

Pursuant to 28 U.S.C. § 636(b) and the Local Rules for the United States District Court, Eastern District of Texas, by order of the District Court, this matter was referred to the undersigned magistrate judge for a hearing and the submission of findings of fact and a proposed recommendation on *Defendant's Motion to Suppress Statement* [Clerk's doc. #15].

### A.   Background

### Facts Adduced at the Hearing

On June 26, 2006, this Court conducted an evidentiary hearing on the motion to suppress. During the hearing, United States Forest Service Special Agent Gary McLaughlin ("McLaughlin") and Defendant Ryan Eff ("Eff") testified.  Mr. McLaughlin is a Special Agent with the United

States Forest Service and has been employed in that capacity for eight years. *Tr., p. 4.*[1] He has approximately 23 years of law enforcement experience. *Tr., p. 5.* McLaughlin had been investigating a series of forest fires which occurred in the Davy Crockett National Forest in 2005 and 2006.[2] *Id.* Those fires are the incidents made the basis of this criminal proceeding.

During this arson investigation, McLaughlin began to consider Eff to be a suspect in the fires. *Tr., p. 8.* McLaughlin had been acquainted with Eff for about three years and knew him to be a employed as firefighter assigned to the Davy Crockett National Forest, along with other areas. *Tr., p. 6.* McLaughlin had received information about Eff from another law enforcement officer that Eff made suspicious comments concerning the fires; Eff had actually discovered some of the fires; and the fires were not set near roads like those usually set by members of the general public.[3] *Tr., pp. 8,66*. McLaughlin shared his suspicions concerning Eff with Henry Smith, the local law enforcement officer assigned to that Forest Service district, and patrol captain David Norsworthy, two other Forest Service officials. *Tr., pp. 9-10.* Eff was not confronted at that time and was apparently unaware that he was under suspicion. *Tr., p. 10.*

The arson fires continued in early 2006, with at least five fires occurring before April 14, 2006. *Id.* McLaughlin's suspicions about Eff increased. *Tr., p. 11.* By this time, agents discovered tire tracks at the point of origin of several fires which were similar to the tread on the tires on Eff's government vehicle. *Id.* In addition, one firefighter notified his supervisors that he observed Eff

---

[1] Citations to the transcript of the June 26 suppression hearing are designated as "Tr." followed by page numbers. The transcript of the April 14, 2006, interview of Eff was admitted into evidence as Government's Exhibit #2. Accordingly, citations to the interview transcript are designated as "Govt. Ex #2" followed by the appropriate page numbers.

[2] There were approximately 23 of these suspicious forest fires in 2005 and 2006. *Tr., pp. 7-8.*

[3] Because the fires were not set near roads but instead off the roads, in other areas of the Forest, McLaughlin felt that the fires were an "inside job". *Tr., p. 9.*

light a fire outside of a containment line into an unburned forest. *Tr., p. 12, 67-68.* McLaughlin obtained a Global Positioning Satellite (GPS) device and had it installed on Eff's government vehicle. *Tr., p. 13.* Utilizing the data from the GPS, McLaughlin was able to place Eff's government vehicle at the point of origin in three subsequent forest fires. *Id.* Again, Eff was not notified that he was under suspicion and continued performing his regular duties. *Tr., p. 15.*

McLaughlin and Norsworthy initially decided to call a meeting with the firefighters and interview each one on April 13, 2006. *Id.* However, this meeting was canceled because another fire was allegedly started by Eff on the night before and the firefighters were busy fighting that particular fire. *Tr., p. 16.*

On April 14, 2006, McLaughlin discovered that Eff was traveling from his duty post to the Forest Service office in Lufkin, Texas to deliver two handheld radios to be programmed by personnel at the Lufkin office.[4] *Id.* McLaughlin called Eff's supervisor and asked for and received permission to interview Eff. *Tr., p. 17.* McLaughlin did so because he had no supervisory authority over Eff. *Tr., p. 18.*

McLaughlin had contacted the Assistant United States Attorney handling the matter prior to the interview and was not authorized to arrest Eff, either before or after the interview on April 14, 2006. *Tr., p. 48.* McLaughlin had advised Norsworthy the day before the interview that Eff would not be arrested and that if he chose to leave the interview he would be free to leave. *Tr., pp. 49-50.* According to McLaughlin, Eff would be free to leave the interview at any time. *Tr., p. 48.*

McLaughlin, who was already in the Lufkin office, called the front desk and told the receptionist to contact him when Eff signed into the building. *Tr., p. 19.* After Eff arrived,

---

[4] The Forest Service's office in Lufkin, Texas is located in the Bank of America building and is the headquarters office for the agency. *Tr., p. 17.*

McLaughlin greeted Eff in the lobby and told him that he would like "to spend some time with him" and that Eff's supervisor had given her approval. *Id.* The fact that investigators wanted to talk to him was, according to Eff, not expected but also not unusual. *Tr., p. 88.* McLaughlin invited Eff to accompany him to a fourth floor conference room and stated that they wanted to interview him. *Tr., p. 20.* They further advised that they were going to begin speaking with all the firefighters, and wanted to start with him. *Tr., p. 20.* McLaughlin stated that Eff was very cooperative. *Id.* Eff, Norsworthy, and McLaughlin then proceeded up to the fourth floor conference room.[5] *Tr., p. 20.*

Once in the conference room, McLaughlin told Eff that he had a list of questions concerning the five most recent fires and wanted to audiotape the conversation. *Tr., pp. 21-22.* Eff gave McLaughlin permission to record the interview. *Id.* McLaughlin took a tape recorder out of his shirt pocket, turned it on, and put it back into his shirt pocket.[6] *Tr., p. 22.* Eff was never given a *Miranda* warning, never specifically told that he did not have to answer any questions, and never informed that he could have an attorney present or terminate the interview. *Tr., p. 71.* Conversely, Eff never asked to terminate the interview. *Tr., p. 82.*

The interview began and McLaughlin informed Eff on tape that he (McLaughlin) needed to interview all the firefighters to obtain information and locate a suspect. *Tr., p. 25, Govt. Ex. #2, p. 2.* Laughlin told Eff that he had been very helpful assisting investigators in other situations. *Id.*

---

[5] Eff and McLaughlin went to Norsworthy's office and the three men then went to the conference room. *Tr., p. 20.* Eff was well-acquainted with the men, having known McLaughlin for three years and Norsworthy for approximately five years. *Tr., pp. 6,20.* The conference room is approximately the size of the undersigned's courtroom (where the hearing was held) and contained tables and chairs. *Tr., p. 21.* McLaughlin was dressed casually and Norsworthy was wearing his green Forest Service uniform. *Tr., p. 26.* Both McLaughlin and Norsworthy wore their service pistols as required by their agencys' respective policies. *Tr., p. 27.*

[6] A compact disc of the recording was admitted into evidence as Government Exhibit # 1 and a transcript was admitted as Government's Exhibit #2. *Tr., p. 25.* The recording device stayed on during the entire interview which lasted approximately two hours and 36 minutes. *Tr., pp. 23,28.*

Therefore, he explained, the agents decided to start with him. *Id.* Eff apparently thought that he was assisting investigators in collecting clues concerning the fires. *Tr., p. 27.* During the first hour of the interview, Eff and McLaughlin talked about an arsonist's methodology in starting the fires. *Tr., p. 29. Govt. Ex. #2, pp. 1 - 80.* In addition, McLaughlin asked Eff a series of questions designed to determine his whereabouts during the fires, so that McLaughlin could compare them with his known locations obtained from the GPS. *Tr., p. 28, Govt. Ex. #2, pp. 1 - 80.* During this time Eff was helpful and cooperative. *Tr., p. 30.* Eff asked whether agents had been tracking the fires on a map and noted that the arsonist seemed to be getting bolder. *Govt. Ex. #2, p. 18.* Eff opined that the arsonist was probably starting the fires with a lighter and that one particular fire did not seem to fit the profile. *Govt. Ex. #2, pp. 29, 38.*

During one particular exchange, McLaughlin's cellular telephone rang, causing McLaughlin to answer and interrupt the interview. *Govt. Ex. #2, p. 49.* McLaughlin apologized to Eff for the interruption, noting that he (McLaughlin) recognized that Eff's time was valuable also. *Id.* Eff spent several minutes discussing his goals, ambitions, and job frustrations with the agents. *Govt. Ex. #2, pp. 63 - 66.*

McLaughlin then changed the tempo of the interview. *Tr., p. 29.* McLaughlin asked Eff if he started the fires and Eff stated that he did not. *Tr., p. 31, Govt. Ex. #2, p. 67.* McLaughlin told Eff that they thought that he was lying and that the Forest Service had two cases that they intended to present to the United States Attorney's Office and that Eff was the target suspect in those particular cases. *Tr., p. 34, Govt. Ex. #2, pp. 70 - 71.* McLaughlin also told Eff that, if the rest of the cases were not cleared with a showing of remorse and cooperation on his part, then it would get "far worse". *Id.* McLaughlin also told Eff that he had evidence that Eff was at the point of origin

at those two fires. *Tr., pp. 33-34, Govt. Ex. #2, p. 71*. During this time Eff looked upset, had gotten quiet, and looked like he was going to "breakdown". *Tr., p. 51*.

McLaughlin stated that the Forest Service is a big family and the greatest interest would served by taking a full and complete case to the United States Attorney's Office and not be forced to file one case after another and drag the matter out. *Tr., p. 35, Govt. Ex. #2, p. 72.* McLaughlin told Eff about the tire tracks and stated that he was giving Eff the best opportunity to get this matter cleared and obtain the best deal with the United States government. *Tr., p. 36, Govt. Ex. #2, p. 72.* McLaughlin stated that he did not have the authority to make deals with the United States Attorney but that he had known them long enough that if they are forced to drag it out and file one case after another "it's going to get ugly". *Tr., p. 36, Govt. Ex. #2, p. 72.* McLaughlin urged Eff to come forward and resolve the matter immediately so that it could be shown to prosecutors that he (Eff) was taking responsibility and being remorseful. *Tr., p. 36, Govt. Ex. #2, p. 73.* The agent further pointed out that no one had been injured by the fires and that it was time for the fires to stop. *Tr., p. 37, Govt. Ex. #2, pp. 73 - 74.* McLaughlin told Eff that McLaughlin could obtain a warrant that day but elected not to do that. *Tr., p. 38, Govt. Ex. #2, p. 74..* The agent stated that this was the best opportunity to get this matter straightened out and that he would "go to bat" for Eff but Eff had to tell the truth. *Tr., p. 38, Govt. Ex. #2, p. 75*

Eff stated that he was "scared to death" but that he trusted McLaughlin and Norsworthy. *Id., Govt. Ex. # 2, p. 75.* Again, McLaughlin told Eff to give a confession on each fire he had started and then McLaughlin could tell the United States Attorney that Eff was a "stand up guy" and that the matter needed to be worked out. *Tr., p. 39, Govt. Ex. #2, p. 75.*

Eff also stated that he needed to know what was going to happen. *Govt. Ex. #2, p. 75.*

McLaughlin responded that there was no way to determine that until the matter is discussed with the United States Attorney's Office and reiterated that he cannot make deals with the United States Attorney. *Govt. Ex. #2, p. 76.* McLaughlin told Eff that he knew that he did not want to cause harm to the Forest Service and was scared but that this was the best opportunity to get thigs straightened out. *Tr., p. 40, Govt. Ex. #2, pp. 76 - 77.*

Importantly, McLaughlin told Eff that Eff could "walk away" but, if he did so, McLaughlin would go straight to the United States Attorney's Office and the prosecutor would say "let's get the ball rolling".[7] *Id.* McLaughlin further stated that Eff could see it end that day. *Id.*

Eff then confessed that he started the fires. *Govt. Ex. #2, p. 78.* Eff stated that he was responsible for starting 15 to 20 of the forest fires. *Tr., pp. 44-45, Govt. Ex. #2, p. 81.* McLaughlin assured Eff that the Forest Service was going to keep this as "low key" as possible and give Eff the opportunity to break the news to his wife. *Tr, p. 52, Govt. Ex. #2, p. 82.* Eff could not believe that he had been caught and told McLaughlin "Gary, you're damn good, brother." *Govt. Ex. #2, p. 84.* Eff guaranteed the agents that the fires would stop. *Tr., p. 47, Govt. Ex. #2, p. 84.* In response, McLaughlin advised Eff that if the fires did not stop, McLaughlin would obtain a warrant for him.[8] *Id.* Eff then gave a lengthy, detailed statement concerning each of the fires which he had started. *Tr., p. 53.*

At one point in the interview, Eff inquired as to whether his office knew where he was. *Govt. Ex. #2, p. 126.* McLaughlin told him that he had informed Eff's supervisor that morning that he wanted to visit with him. *Id.* McLaughlin said that he would call her again and tell her that Eff

---

[7] McLaughlin testified that he wanted Eff to know that he could walk away from the interview if he wanted to but the criminal case against him would proceed and was not going away. *Tr., p. 50.*

[8] According to McLaughlin, even after Eff confessed he did not have the authority to arrest him. *Tr., p. 52.*

was going to be "tied up with us a little bit longer, working with us on this fire thing." *Id.* Near the end of the interview, McLaughlin asked if Norsworthy and Eff if they needed anything else to drink.[9] Eff replied "how about beer?" *Govt. Ex. #2, p. 129.* At the conclusion of the interview, Eff acknowledged on tape that during the entire interview he understood that he was not under arrest, that his cooperation was voluntary, and that he had not been threatened or promised anything. *Tr., pp. 56-57, Govt. Ex. #2, p. 143.*

Once the interview was concluded, McLaughlin, Norsworthy, and Eff went to lunch at a restaurant in Lufkin, Texas. *Tr., p. 58.* Eff's government vehicle was seized for evidentiary purposes so the agents agreed to give Eff a ride back to his duty station in Ratcliff, Texas. *Id.* Eff then expressed concern about how it would look to his co-workers if the agents dropped him off at the office because people would talk. *Tr., p. 60.* The agents agreed to drive Eff home, which they did.[10] *Id.*

**<u>Defendant's Motion</u>**

Eff contends that the inculpatory statements that he made on April 14, 2006, were given while he was "in custody" and he was not given his *Miranda* warnings.[11] *See Defendant's Motion.* He further contends that the statements were taken in violation of Title 18, United States Code, Section 3501, and were not freely and voluntarily given, but were the result of coercion and duress and the product of promises of leniency and other benefits. *Id.*

---

[9] Earlier, Eff was allowed to use the restroom and McLaughlin obtained soft drinks. *Tr., p. 53, Govt. Ex. #2, p, 99.*

[10] Eff gave McLaughlin permission to retrieve a cigarette lighter that he used to start fires from his personal vehicle which was at the office parking lot in Ratcliff, Texas. *Tr., p. 60.* He also gave McLaughlin permission to retrieve a file from his work area. *Tr., p. 62.* After retrieving the evidence, McLaughlin drove Eff's vehicle and dropped it off at his residence. *Tr., p. 60.*

[11] *Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

**The Government's Response**

The Government filed its *Response to Defendant's Motion to Suppress* [Clerk's docket #19]. In its response, the Government agrees that Defendant was interrogated about his involvement in setting the fires and was not given a *Miranda* warning. *Government's Response, pp. 2-3*. However, the Government contends that in this case, Defendant was not formally arrested nor was there a restraint on his freedom of movement of the degree associated with a formal arrest so as to be "in custody" for purposes of *Miranda. Id., p. 3*. The Government further responds that Defendant's statements were not the result of undue duress or coercion. *Id.*

B.   **Legal Analysis**

**Was Eff "in custody" for Purposes of *Miranda*?**

"The Fifth Amendment privilege against self-incrimination prohibits admitting statements given by a suspect during custodial interrogation without a prior warning." *Illinois v. Perkins*, 496 U.S. 292, 296, 110 S. Ct. 2394, 2396-97, 110 L. Ed.2d 243 (1990). *Miranda'*s procedural safeguards attach "only where there has been such a restriction on a person's freedom as to render him 'in custody'". *Stansbury v. California*, 511 U.S. 318, 322, 114 S. Ct. 1526, 128 L. Ed.2d 293 (1994). To ascertain whether an individual was in custody, we examine all of the circumstances surrounding the interrogation, but ultimately ask "whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *Id.*

A person is "in custody" for purposes of *Miranda* when he is placed under formal arrest or when a reasonable person in the position of the suspect would understand the situation to constitute a restraint on freedom of movement to the degree that the law associates with formal arrest. *United States v. Galberth*, 846 F.2d 983, 986 n.1 (5th Cir. 1988), *cert. denied* 588 U.S. 865 (1988); *United*

*States v. Bengivenga*, 845 F.2d 593, 596 (5th Cir. 1988), *cert. denied* 588 U.S. 865 (1988). The reasonable person through whom the court must view this situation must be "a person who is neutral to the purposes of the investigation – that is, neither guilty of criminal conduct and overly apprehensive nor insensitive to the seriousness of the circumstances." *Bengivenga,* 845 F.2d at 596.

The facts of a seminal United States Supreme Court opinion are instructive. In *Oregon v. Mathiason*,[12] a police officer investigating a burglary developed a suspect after interviewing the victim. 429 U.S. at 493. The officer left a card on the suspect's door which stated that the officer wished to speak with him. *Id.* The suspect called the officer and an interview was scheduled that afternoon at the police station. *Id.* The suspect was advised that he was not under arrest and was interviewed in an office by the officer. *Id.* The door was closed and the officer informed the suspect that he wanted to talk with him about a burglary and that his truthfulness could possibly be considered by the district attorney or judge. *Id.* The detective also falsely told the suspect that his fingerprints were found at the scene. *Id.* The suspect then confessed and the officer released him and referred the case to the district attorney. *Id.* at 493-94.

In per curiam opinion, the United States Supreme Court reversed the Supreme Court of Oregon and held that there was no indication that the questioning took place in a context where the respondent's freedom to depart was restricted in any way. *See id.* at 495. The Supreme Court noted that he voluntarily came to the police station, was informed that he was not under arrest, and did in fact leave the police station without hindrance. *Id*. It was clear from those facts that he was not in custody "or otherwise deprived of his freedom of action on any significant way." *Id*.

This Court finds that, on April 14, 2006, Eff was not formally arrested nor was his freedom

---

[12] 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977) (per curiam)

of movement restrained to any degree associated with that of a formal arrest. The record shows that Eff was never under arrest. McLaughlin testified that he had no authority to arrest Eff, either before or after the confession. *Tr., p. 48.* Eff was not ordered to give a statement to McLaughlin, McLaughlin merely asked Eff if he would "spend some time with him", and voluntarily did so. *Tr., pp. 19 - 20.* Eff was not interrogated by strangers, but was questioned by agents that he was very familiar with. *Tr., pp. 6, 20.* Eff apparently had assisted these very agents in the investigation of other criminal matters and had known them for years. *Tr., pp. 6, 20, Govt. Ex. #2, p. 7.* Eff himself testified that the fact that the agents wanted to talk to him was not unusual. *Tr., p. 8.*

There was nothing intimidating about the location of the interview. The conference room was a large room and contained tables and chairs. *Tr., p. 21.* Eff was not locked in. *Tr., p. 52.* On one occasion McLaughlin left the room to purchase a soft drink for Eff and Eff was allowed to use the restroom. *Tr., p. 53.* Accordingly, Eff was not physically restrained in any manner. If fact, Eff admitted during cross-examination that he was never restrained in the typical fashion like someone under arrest. *Tr., p. 98.* Although the agents carried their service weapons there was no evidence which even suggested that they intimidated Eff. Eff admitted that McLaughlin never touched him, never touched his gun, or tried to physically intimidate him. *Id.* Eff never asked to leave the room or to terminate the interview. *Tr., p. 82, Govt Ex. #2.* McLaughlin even apologized to Eff for taking a call on his cell phone, noting that he recognized that Eff's time was valuable. *Govt. Ex. #2, p. 49.* As the tenor of the interview changed, shortly before Eff confessed, McLaughlin actually told Eff that he could "walk away". *Tr., p. 40, Govt., Ex. #2, pp. 76 - 77.* Shortly after Eff confessed, McLaughlin told him that he would obtain a warrant for him if the fires continued *Tr., p. 77*, which would certainly confirm to Eff that he was not being detained. Importantly, at the end of the

-11-

interview, Eff confirmed on tape that during the interview he understood that he was not under arrest and his cooperation was voluntary. *Tr., pp. 56 - 57, Govt. Ex. #2, p. 143.* When the interview was over, Eff was not arrested; the agents took Eff to lunch and brought him home. *Tr., pp. 58 - 60.*

Eff testified that he felt like he could not leave the room because he felt like "I had my back against the wall, like a job situation". *Tr., p. 90.* It appears that Eff may be suggesting that he felt that he could not terminate the interview because it could negatively impact his career with the Forest Service. This is simply not relevant to the question of whether a reasonable person would feel that he was restrained to a degree associated with a formal arrest. *See United States v. Mahan*, 190 F.3d 416, 422 (6th Cir. 1999)("it is simply of no moment that Mahan had been summoned to the interview by one of his supervisors at work").

This Court has reviewed the recording of the interview and read the transcript. There is no evidence that Eff was restrained in any manner, nor was he verbally abused. He was not questioned in a hostile or coercive environment. McLaughlin and Norsworthy were cordial and professional. In conclusion, no reasonable person in this situation would feel that his freedom of movement was restrained to a degree associated with a formal arrest so as to be "in custody" for purposes of *Miranda*.

### Were Eff's Statements Freely and Voluntarily Made?

In his motion, Eff contends that his statements were based on duress and coercion and were not freely and voluntarily made because, at the time of questioning, he felt that his silence could be used as a "negative inference" which may result in the loss of his job or other sanctions. *See Defendant's Motion, p. 3.*

A confession is voluntary if, under the totality of the circumstances, the statement is the

product of the accused's free and rational choice. *United States v. Scurlock*, 52 F.3d 531, 536 (5th Cir. 1995). To be considered voluntary, a confession cannot be the product of official overreaching in the form either of direct coercion or subtle forms of psychological persuasion. *Id.* The Government has the burden of showing by a preponderance of the evidence that the statements were voluntarily made. *Id.*

After careful examination of the record, this Court factually finds that it is devoid of any suggestion that Agents McLaughlin and Norwsorthy gave any indication to Eff, directly or indirectly, that his failure to cooperate and answer their questions would have negative implications on his career with the Forest Service. Even before he confessed, McLaughlin advised Eff that a career in law enforcement will be out of the question. *Govt. Ex. #2, p. 77.* During the interview, after Eff confessed to starting approximately five fires but was hesitant to assume responsibility for the rest, Eff commented "this is my career, man". *Govt. Ex. #2, p. 79.* McLaughlin advised Eff that his career was in trouble anyway. *Id.* This Court cannot read into these comments any implication that a failure to cooperate would have a negative impact on Eff's career. It appears from these comments that Eff is concerned about the opposite, that confessing fully to the arsons would adversely affect his career. There is no evidence of psychological persuasion by the agents regarding Eff's career. Again, Eff agreed on the tape that his cooperation was voluntary and that he had not been threatened or promised anything by the agents. *Govt. Ex. #2, p. 143.* The Government has proved by a preponderance of the evidence that Eff's confession was voluntary in this regard.

Eff also complains that the agents made promises and offers of leniency by the agents which rendered his confession involuntary. *Defendant's motion, p. 3.* Eff specifically complains that agents told him repeatedly that it was advantageous for him to cooperate with them and get the best

-13-

deal from the United States Attorney's Office. *Id.* McLaughlin told Eff that he did not have the authority to make deals with the United States Attorney but that he had known them long enough that if they are forced to drag it out and file one case after another "it's going to get ugly". *Tr., p. 36, Govt. Ex. #2, p. 72.* At the outset, this Court notes that McLaughlin specifically told Eff that he (McLaughlin) could not make any deals with the United States Attorney's Office. *Govt. Ex. #2, p. 76.* Eff agreed with McLaughlin that no promises had been made. *Govt. Ex. #2, p. 143.* At most, McLaughlin agreed to show the United States Attorney that Eff was taking responsibility and taking remorse.

The Fifth Circuit Court of Appeals has held that an agreement that the United States Attorney would be apprised of the defendant's cooperation coupled with an express admonition that the defendant would still go to prison did not constitute a promise of leniency. *See United States v. Broussard*, 80 F.3d 1025, 1034 (5th Cir. 1996), *cert. denied* 519 U.S. 906 (1996); *see also United States v. Ballard*, 586 F.2d 1060, 1063 (5th Cir. 1978) (concluding that a statement that the accused's cooperation will be made known to the court is an insufficient inducement to render subsequent confession involuntary); *United States v. Ornelas-Rodriguez*, 12 F.3d 1339, 1348 (5th Cir. 1994), *cert. denied* 512 U.S. 1222 (advising accused that there are advantages to cooperating does not render confession involuntary). Likewise, McLaughlin's statements that he would make Eff's cooperation and remorse known coupled with the admonition that he could not broker any deal with the United States Attorney's Office does not constitute a promise of leniency which would render Eff's confession involuntary.[13]

---

[13] In response to Eff's statement "I need to know what's going to happen" McLaughlin responded "there's no way we can determine that until we take it to the U.S. Attorney's Office and there's no way I can get around that. Like I told you a while ago, I have no way to make deals with the United States Attorney. He has to see it all, and he has to know that you are being honest." *Govt. Ex. #2, pp. 75 - 76.*

As a final matter, it should be noted that Eff also alleges that his statements were taken in violation of Title 18, United States Code, Section 3501. *Defendant's motion, p. 1.* Title 18, United States Code, Section 3501(a) provides that confessions shall be admissible if voluntarily given and directs the trial court to determine the issue of voluntariness outside the presence of the jury. 18 U.S.C. § 3501(a). Subsection (b) directs the trial court to consider six (6) factors when determining the issue of voluntariness. 18 U.S.C. § 3501(b). Under Title 18, United States Code, Section 3501(a) "a voluntariness hearing" is not required for a statement which was made when the suspect was not in custody. *United States v. Diezel*, 608 F.2d 204, 207 (5th Cir. 1979). However, in this case the Court conducted a hearing outside the presence of the jury and will, in an abundance of caution, consider the six (6) factors set forth in 18 U.S.C. § 3501(b). Under the statute, the presence or absence of any of the factors need not be conclusive on the issue of voluntariness of the confession. 18 U.S.C. § 3501(b).

The first factor the Court is to consider is the amount of time elapsing between the arrest and the arraignment if the confession was made after arrest but before arraignment. This factor is not applicable since the statements in question were made before Eff's arrest.

The second factor is whether the defendant knew the nature of the offense for which he was suspected. It is clear that Eff knew that he was being questioned about the fires and McLaughlin specifically informed him that he was a target suspect.

The third factor is whether Eff was advised or knew that he was not required to make a statement and that it could be used against him. The agents never advised Eff of his *Miranda* warnings. However, Eff, who had previously taken college classes in criminal justice, admitted that he "probably" learned some things about the rights of an accused when they are being interrogated

and that non-lawyers and police officers know something about the *Miranda* case. *Tr., pp. 95 - 96.* Eff then admitted that he was not completely unwitting about his rights based on his own education. *Id.* This Court can conclude that Eff was not completely ignorant of his constitutional rights.

The fourth factor is whether or not the defendant had been advised of his right to counsel and the fifth factor is whether the defendant utilized the assistance of counsel. In both cases the answer is no.

Considering the factors set forth in Title 18, United States Code, Section 3501, along with the testimony and evidence presented to the Court at the hearing conducted in this matter, this Court finds that the statements made by Eff on April 14, 2006 were also freely and voluntarily made. Therefore, Defendant's *Motion to Suppress Statement* [Clerk's doc #15] should be denied on this ground.

### C.     **Conclusion and Recommendation of the Court**

Accordingly, having considered the factors and evidence presented, the Court finds that (1) Defendant was not in custody at the time of the interview in question and (2) Mr. Eff's statements were made freely and voluntarily. Based upon the findings of fact and conclusions law stated herein, the undersigned magistrate judge recommends that the District Court deny Defendant's *Motion to Suppress Statement* [Clerk's doc. #15].

### D.     **Objections**

Pursuant to 28 U.S.C. § 636(b)(1)(C), all parties are entitled to serve and file written objections to the report and recommendation of the magistrate judge within ten (10) days of receipt of this report. Failure to file specific, written objections to the proposed findings of facts, conclusions of law and recommendations contained within this report within ten (10) days after

service shall bar an aggrieved party from *de novo* review by the District Judge of the proposed findings, conclusions and recommendations, and from appellate review of factual findings and legal conclusions accepted by the District Court except on grounds of plain error. *See Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Douglass v. United Serv. Auto. Ass'n.,* 79 F.3d 1415 (5th Cir. 1996) (*en banc*); 28 U.S.C. § 636(b)(1). The constitutional safeguards afforded by Congress and the courts require that, when a party takes advantage of his right to object to a magistrate's findings or recommendation, a district judge must exercise its nondelegable authority by considering the actual evidence and not merely by reviewing and blindly adopting the magistrate's report and recommendation. *See Hernandez v. Estelle,* 711 F.2d 619, 620 (5th Cir. 1983); *United States v. Elsoffer*, 644 F.2d 357, 359 (5th Cir. 1981) (per curiam).

**SIGNED this the 6th day of July, 2006.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE